IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| IN RE: ) | |
| ) | Chapter 7 |
| MICHAEL R. RECKER, ) | |
| ) | |
|     Debtor. ) | Bankruptcy No. 09-01541 |
| ------------------------------------------- | |
| CHELSEA SAVINGS BANK, ) | |
| ) | Adversary No. 10-9021 |
|     Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| MICHAEL C. DUNBAR, ) | |
| MICHAEL R. RECKER, ) | |
| ) | |
|     Defendants. ) | |

**ORDER RE: DETERMINATION OF PROPERTY OF THE ESTATE AND FOR TURNOVER OF COLLATERAL SALE PROCEEDS TO PLAINTIFF**

This adversary proceeding came before the undersigned on June 3, 2010, on Plaintiff Chelsea Savings Bank's Motion for Determination of Property of the Estate and for Turnover of Collateral Sale Proceeds to Plaintiff. Attorney Ray Terpstra appeared for Plaintiff Chelsea Savings Bank, along with Chelsea Savings Bank President Curtis Brown and Mr. Terpstra's intern, Elizabeth Terpstra. John Schmillen appeared for the U.S. Trustee. Michael Dunbar appeared as Chapter 7 Trustee. Debtor Michael Recker appeared but left during the hearing. After arguments and presentation of evidence, the Court took the matter under advisement. The deadline for filing briefs was extended two times. The final extension for filing briefs has now

passed, and this matter is now ready for resolution. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A).

## I. STATEMENT OF THE CASE

Plaintiff Chelsea Savings Bank ("the Bank") filed an adversary proceeding requesting that the Court find that proceeds from the sale of a combine (in the sum of $52,039.00) are collateral sale proceeds to which the Bank was entitled. The Chapter 7 Trustee resisted the Complaint, denying the sale proceeds are the Bank's property and arguing the proceeds are property of the bankruptcy estate. Debtor Michael Recker also resisted and argued that he never owned the combine and thus the proceeds are not Bank collateral or property of the estate. Instead, Mr. Recker claimed the proceeds belong to another person not a party to the case. He also asserted the Bank cancelled the debt and/or the debt has been paid by a special written instrument. Therefore, he asserted the Bank could not be entitled to any proceeds even if they belonged to him.

## II. PROCEDURAL BACKGROUND AND CASE HISTORY

Michael R. Recker, d/b/a Recker Salvage, filed for voluntary Chapter 7 bankruptcy on June 2, 2009. As is his right, Mr. Recker has represented himself throughout the case. Mr. Recker's bankruptcy case has included numerous filings, as evidenced by the 69 docket entries over the last 15 months, including four adversary proceedings. Two of these adversary proceedings were brought by creditors seeking to deny dischargeability of Mr. Recker's debts to them under various provisions of 11 U.S.C. § 523. The first adversary was filed by NAEDA Financial, Ltd. The second adversary was brought by Chelsea Savings Bank which (in addition to the § 523 arguments) also sought to deny discharge to Mr. Recker under 11 U.S.C. § 727. The United

2

States Trustee (U.S. Trustee) brought the third adversary, also objecting to Mr. Recker's discharge under 11 U.S.C. § 727(a).

The fourth adversary proceeding, also brought by Chelsea Savings Bank, is the matter presently before the Court. The Bank filed for a determination of whether the proceeds of a combine the Bank sold were property of the estate and, if so, for turnover of those proceeds to the Bank. The Bank listed Chapter 7 Trustee Michael C. Dunbar (case Trustee) and Mr. Recker as Defendants. Mr. Recker continued to represent himself in the numerous adversaries brought against him, including the present one.

On March 4, 2010, this Court entered an order setting a status conference on all pending cases and proceedings. In that order, the Court noted that while four adversary proceedings had been filed, the Court already had granted default judgment on the U.S. Trustee's adversary complaint requesting denial of Mr. Recker's discharge under § 727. The Court noted the appeal period had passed and judgment was final. The Court set the in-court conference to clarify the status of Mr. Recker's Chapter 7 case and the four adversary proceedings for all interested parties.

The Court held the status conference in Cedar Rapids on March 31, 2010. Michael Recker appeared pro se. The case Trustee Michael Dunbar was present. Ray Terpstra represented Chelsea Savings Bank. Michael Whaley represented NAEDA Financial, Ltd. John Schmillen appeared on behalf of the U.S. Trustee. The Court summarized all pending matters and specifically addressed each of the adversaries. The Court first noted that the adversary case <u>United States Trustee v. Recker</u>, Adv. No. 09-09136, could be closed because a default judgment was entered and no appeal was filed. The Court further noted the judgment in that proceeding provided for denial of discharge against Debtor Michael R. Recker.

3

In addressing NAEDA Financial, Ltd. v. Recker, Adv. No. 09-09121, the Court noted that a default had been entered by the Clerk of Court and there was a Motion for Default Judgment pending. The Court gave counsel for NAEDA time to determine whether to continue with the adversary given that a denial of Mr. Recker's discharge had been entered in the case brought by the U.S. Trustee.

The Court next addressed the first adversary case brought by the Bank against Mr. Recker, Adv. No. 09-09129, which sought to deny discharge of Mr. Recker's debt to the Bank under 11 U.S.C. § 523(a) and to deny Mr. Recker discharge under § 727(a). Counsel for the Bank advised the Court that the default judgment in the U.S. Trustee's case resolved all issues in the Bank's first adversary. The Court dismissed that adversary proceeding without prejudice.

The Court then discussed the final pending adversary case, Chelsea Savings Bank v. Dunbar and Recker, Adv. No. 10-09021—the subject of this decision. After discussion with Mr. Recker and all counsel, the Court noted the combine sale proceeds were the only asset of the estate and the parties' respective rights in them still needed to be determined. The Court went on to inquire of all parties what they needed to get the case ready by the previously-scheduled trial date of June 3, 2010. The Court spent significant time speaking to Mr. Recker. The Court asked him to identify exactly what he needed to have the case ready for trial. After hearing from him and the other parties, the Court concluded discovery could be completed by April 30, 2010. The Court also ordered all parties to provide the Court with a list of witnesses no later than that same date. Neither Mr. Recker nor any of the other parties raised any complaints about or objections to those deadlines.

4

Following the March 31, 2010 status conference, the Court filed a written order summarizing the proceedings and specifically setting out the April 30, 2010 date for discovery to close and witness lists to be filed. Mr. Recker did not file a motion to extend time for discovery or a witness list before June 3, 2010. The Bank and the Trustee filed their witness and exhibit lists and prepared for trial.

On the morning of trial, June 3, 2010, just prior to the 9:30 a.m. start time, Mr. Recker filed a Motion for Continuance. The entirety of the Motion to Continue stated as follows:

> **COMES NOW**, Debtor, Defendant, Michael Raymond Recker, and hereby states:
>
> 1. Michael R. Recker requests a continuance to further prepare.
>
> 2. No attorney can appear in court without the physical human being he represents. **"Agents can not testify for principals."**
>
> 3. **H. Raymond Terpstra II** is an agent for the principal, **"Chelsea Savings Bank".**
>
> 4. Chelsea Savings Bank has **"unclean hands"** in this instant matter and <u>cannot</u> produce the "Original Wet Ink Signed Contract" **note**, and has caused injury to Michael Recker in this matter.
>
> 5. This is Michael Recker's first request for a continuance, and is in good faith.
>
> 6. Prejudice would result to move forward without a continuance in this matter of controversy.
>
> **WHEREFORE**, in good faith, the undersigned respectfully request this court grant this Motion for a continuance.

(Emphasis in original).

5

The Court took up Mr. Recker's Motion to Continue before starting the trial. The Bank, the case Trustee, and the U.S. Trustee all objected to the continuance. The Court discussed the continuance at length with the parties, particularly Mr. Recker. Mr. Recker restated the arguments made in his written motion and then referenced the fact that he was a pro se party and needed more time to prepare. Mr. Recker also noted several times that the proceedings were "illegal" for the reasons stated in his written motion and for the additional reason that the Court was displaying an improper flag (one with gold fringe) in the courtroom.

The Court denied Mr. Recker's motion for continuance. The Court noted the last-minute nature of the filing, that other parties had gone through the time and expense to prepare, that the earlier status conference specifically addressed what he needed to prepare, and the lack of a compelling reason to grant the continuance. The Court noted the Bank had subpoenaed witnesses, including the person Mr. Recker claimed to be the owner of the combine, and they had all taken the time and expense to be present for the trial. The Court carefully explained that Mr. Recker's arguments for continuance directed against the Bank and Mr. Terpstra acting as their attorney and agent could all be made during the trial. The Court noted its willingness to receive additional authorities and arguments on those issues from Mr. Recker.

The Court also specifically recited (as noted earlier by Mr. Schmillen) that a pro se party is required to comply with relevant procedural and substantive rules and must be treated the same as any other party represented by counsel—no better and no worse. The Court noted that Mr. Recker had acted on his own behalf during the entire bankruptcy case and pointed out that while Mr. Recker had every right and freedom to make that decision, he took all the benefits and burdens of that decision.

Mr. Recker then informed the Court that he was considering leaving before trial started because he viewed the whole proceeding as "illegal." Again, he reiterated his belief that the Bank could not appear through a lawyer or any other agent it sent to Court. He claimed, as he has throughout the case, that the actual corporate body must be present. He also argued he had submitted a "Bonded Promissory Note" to the Bank and the Bank was required to take the "Bonded Promissory Note" in full satisfaction of its claim.

The Court again reiterated its willingness to take any arguments or authorities Mr. Recker had on those issues. The Court also reminded Mr. Recker that he would be allowed to present his testimony and cross-examine other witnesses (as he had previously requested to do on several occasions) and that this was his only chance to do so. The Court then took more time to respond to various other questions and concerns raised by Mr. Recker. When the Court told him it was time to move forward with the trial, Mr. Recker got up and left the courtroom.

Trial was held and completed on June 3, 2010 in Mr. Recker's absence. At the end of the trial, the Court took the matter under submission and provided the parties the right to file additional arguments and authorities. In spite of his boycott of the trial, Mr. Recker filed a request for additional time to file a brief on the issues under advisement. This Court entered an order granting in part and denying in part Mr. Recker's Motion for Additional Time to file a brief. Counsel for both the Bank and the case Trustee filed their briefs. However, soon after filing their briefs, counsel filed documentation with the Court indicating they had resolved their respective rights to the proceeds of the combine sale. They stated the only issue remaining was whether the combine sale proceeds were actually property of the estate. They also noticed their settlement for

7

objections by interested parties.   The deadline for objections was set for July 21, 2010.   No such objection was filed by Mr. Recker or anyone else.

The Court's own review of the file confirms that the only remaining issue is whether the combine sale proceeds are property of Mr. Recker's bankruptcy estate.   This issue affects Mr. Recker's rights and the arguments he has made throughout the case.   Because the filings subsequent to trial by the Bank and case Trustee pushed back the decision in this case, the Court, on its own motion, again took up Mr. Recker's request for additional time to file a post-trial brief. Mr. Recker had previously requested an extension into some time in August 2010.   The Court originally granted him and other parties a shorter extension.   However, because the Bank and case Trustee had filed the documents on settlement, thereby pushing the timetable back, the Court decided Mr. Recker should have more time.   The Court did not believe an additional extension to Mr. Recker would significantly further delay the case, and therefore the Court granted Mr. Recker's original request and gave him until mid-August to file his brief.   The Court ordered that the brief of Mr. Recker, and any other briefs and arguments made by the other parties, would be due Friday, August 13, 2010.

Instead of filing a brief by August 13, 2010, Mr. Recker filed an "Affidavit of Fact."   The document stated:

> I, the DEFENDANT appeared June 3, 2010 for ROLL CALL, Declare true and correct to the following:   The PLAINTIFF: CHELSEA SAVINGS BANK received the bonded promissory note, per truth and lending was never returned; further sayeth; The ORIGINAL NOTE was NOT evidenced to the court.

8

Mr. Recker offered no authority or legal citation to accompany the affidavit, nor did he explain the consequences of any of the statements he made in the body of the affidavit.  Following the text, the affidavit read:

> MICHAEL RAYMOND RECKER:   DEBTOR - - AUTOTRIS #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
> _____
> MICHAEL RAYMOND RECKER:   DEBTOR - - AUTOTRIS #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

It then contained Mr. Recker's signature under the heading "Authorized representative," followed by a line of text identifying the signature as:  "Michael Raymond Recker; Creditor - - CUSIP #484989728."  Mr. Recker provided no further description about the meaning or legal consequences of any of these notations.

### III. FINDINGS OF FACT

Based on the evidence offered at trial, the Court makes the following findings of fact. Debtor Michael Recker is employed in the salvage business.  In the summer or fall of 2008, Mr. Recker solicited from Ron Miller, a Cascade, Iowa farmer and salvager, a "bid" for a 1999 John Deere Combine that was being sold as salvage by Farmers Mutual Insurance Company.  Mr. Miller appeared at trial and testified that he submitted a bid for the combine to Farmers Mutual at the direction of Mr. Recker.  Mr. Miller stated that he was unsure about why Mr. Recker asked him to submit the bid, but did not question Mr. Recker.  Mr. Miller testified that he was never notified about the result of the auction or if his was the winning bid.  He never took possession of or acquired any ownership of the combine at issue.  Mr. Recker paid Farmers Mutual $26,200.00 to purchase the combine with a check dated February 13, 2009.

On April 5, 2009, Mr. Recker consigned the combine for sale to Southwest Auction Company in Texas.  The combine was sold at the auction.  Southwest Auction issued a check

dated April 30, 2009 for $52,039.00, payable to Mr. Recker. Mr. Recker tendered this check to Duane Benda, an Elpron, Iowa farm machinery salesman and farm supplier, who Mr. Recker owed $4,539.00. Mr. Benda appeared at trial and testified that he accepted the check from Mr. Recker as payment of the debt and issued a check back to Mr. Recker in the amount of $47,500.00. Mr. Benda accepted the check from Mr. Recker because he knew Mr. Recker did not have a bank account anywhere.

On May 19, 2009, Mr. Recker took the check from Mr. Benda to the Chelsea Savings Bank (which was Mr. Benda's bank) in Van Horne, Iowa. Mr. Recker attempted to negotiate the check. A former Bank employee, Barb Barr, appeared at trial and testified she was working at the Bank on May 19, 2009 when Mr. Recker came in. She stated that a newer employee was originally waiting on Mr. Recker. Ms. Barr eventually went over to try and assist. Ms. Barr testified that Mr. Recker had presented the check from Mr. Benda and requested multiple cashier's checks made out to various parties. Mr. Recker wanted the remainder in cash. The parties listed on the bank ledger for whom Mr. Recker requested cashier's checks include: Farmers Mutual; Farm Bureau; Jason Elgae; Dean Hoffman; and Hoffman Trust. Ron Miller is not on the list, even though Mr. Recker now has repeatedly alleged in this case that Mr. Miller owns the combine and is entitled to its sale proceeds. Ms. Barr was aware that Mr. Recker owed substantial money to the Bank and did not allow him to complete the transaction.

At the hearing, Mr. Miller also testified about a letter allegedly written by him dated May 22, 2009. The letter, which was sent to Southwest Auction Company, states that "Mike Recker does not own [the] combine [at issue], Mike is just selling it for [Ron Miller]." The letter purported to be signed by Mr. Miller. Mr. Miller testified that he did not write the letter and he

10

did not give Mr. Recker or anyone else permission to write or sign the letter on his behalf. This testimony is supported by an affidavit from Mr. Miller dated November 19, 2009, that was admitted at trial without objection. The affidavit reiterates that Mr. Recker asked Mr. Miller to prepare a bid for the combine, that Mr. Miller does not own the combine, that he never paid for the combine, and that he never attempted to auction the combine. Mr. Miller testified that Mr. Recker asked him to have Southwest Auction issue the check for the combine sale proceeds in Mr. Miller's name, and that Mr. Miller refused.

### IV. CONCLUSIONS OF LAW AND ANALYSIS

As noted above, the central issue remaining for the Court to resolve is whether the proceeds from the sale of the combine are property of the estate. More particularly, the issue is whether the proceeds can be administered as part of Mr. Recker's bankruptcy for distribution to creditors or whether they belong to Ronald Miller – a non-party to the case – as Mr. Recker has repeatedly argued. Mr. Recker also appears to argue that the Bank has no claim to the proceeds, as it has received all it is entitled to by virtue of the "Bonded Promissory Note" Mr. Recker has given the Bank. The Court will address these issues after first addressing a few preliminary matters that arose at the time of trial.

**A.** **Preliminary Matters Raised by Mr. Recker at Hearing Before Trial**

Mr. Recker raised several issues while he was in attendance at the June 3 hearing. Mr. Recker argued that the Court should hold him to a different, more relaxed, standard than the other parties to the hearing because he was appearing pro se. He argued that the proceeding was invalid because the Court displayed the improper flag and because the Bank did not "appear" as a physical entity in Court.

11

1.      **Standard for Pro Se Litigants**

Mr. Recker objected to the Court not granting his continuance because he was unprepared for the June 3 proceeding.   Mr. Recker argued that the Court should hold him to a different standard than the other parties to the June 3 proceeding because he appeared pro se.   The Court rejected Mr. Recker's Motion to Continue as being too late in time, unfairly prejudicing the other parties, and unavailing because he had been aware of the proceeding and able to prepare for some time.   In reaching that conclusion, the Court referenced the fact that governing law requires that pro se parties be held to the same standards as parties represented by attorneys.   Harmon Autoglass Intell. Prop., LLC v. Leiferman (In re Leiferman), 428 B.R. 850, 854 (B.A.P. 8th Cir. 2010); see also In re Enron Corp., 352 B.R. 363, 366 (Bankr. S.D.N.Y. 2006) ("Pro se status, however, does not exempt a party from compliance with relevant rules of procedural and substantive law.") (citation omitted); In re Jones, 2005 WL 486758, *2 (Bankr. W.D. Mo. Feb. 4, 2005) ("[P]ro se debtors are held to the same standards as debtors represented by counsel."); In re Schaefer, 154 B.R. 227, 231 (Bankr. S.D. Tex. 1993) ("Pro se litigants are bound by the Bankruptcy Code . . . just as any other party represented by counsel.").   Mr. Recker appeared to be surprised by this, and voiced his view that he believed that pro se parties were entitled to more relaxed standards.   The above case law citations demonstrate this is not the case.

The Court then reiterated its conclusion that the case should proceed.   The trial date had been scheduled for many months.   An order dated April 9, 2010 set deadlines for witness lists and discovery after consulting Mr. Recker.   Mr. Recker did not comply with the deadlines and waited to request a continuance of the June 3 proceeding until the morning of trial – when all parties appeared and several citizens appeared to testify.   He did not even raise his pro se status in his

12

written motion. The first mention he ever made of it was during the arguments on the motion. The Court finds that treating Mr. Recker the same as the represented parties and denying his request for a continuance were appropriate decisions in these circumstances.

2.  **Flag**

Mr. Recker also objected that the June 3 proceeding was invalid because the Court was displaying an improper flag. Mr. Recker argued that the American and Iowa flags were improperly adorned with gold fringe and that a courtroom that displays such flags lacks authority to adjudicate Mr. Recker's matter. The American flag displayed in the Bankruptcy Court courtroom comports with the United States Code, which provides that "[t]he flag of the United States shall be thirteen horizontal stripes, alternate red and white; and the union of the flag shall be forty-eight stars, white in a blue field", 4 U.S.C. § 1, with one star added for each additional state, 4 U.S.C. § 2. Courts addressing arguments that gold fringe on a courtroom-displayed flag affects a court's jurisdiction have explicitly rejected those arguments. See McCann v. Greenway, 952 F.Supp. 647, 650 (citing United States v. Greenstreet, 912 F.Supp. 224, 229 (N.D. Tex. 1996)), Commonwealth v. Appel, 652 A.2d 341, 343 (Pa. 1994), and Leverenz v. Torluemlu, 1966 WL 272538, at *1 (N.D. Ill. May 20, 1996)). These cases have gone so far as to label such arguments "frivolous," "preposterous," and "really unintelligible . . ." Id. This Court concludes that the flags displayed did not affect the validity or legality of this proceeding.

3.  **Corporation "Appearing"**

Mr. Recker also argued that the June 3 proceeding was invalid because Chelsea Savings Bank, "the body," was not present in the courtroom. Corporations are artificial entities appropriately created by persons through the legal system. See Palazzo v. Gulf Oil Corp., 764

13

F.2d 1381, 1385 (11th Cir. 1985). See also Turner v. American Bar Assn., 407 F.Supp. 451, 476 (N.D. Ind. 1975) ("Corporations and partnerships, both of which are fictional legal persons, obviously cannot appear for themselves personally."). As artificial entities, corporations can only act through agents. Id. Courts have uniformly held that corporations and other properly established artificial entities can appear and participate in Court through counsel. Commercial & Railroad Bank of Vicksburg v. Slocomb, 39 U.S. (14 Pet.) 60 (1840); U.S. v. Lylalele, Inc., 221 F.3d 1345 (8th Cir. 2000); In re N.N.E., 752 N.W.2d 1 (Iowa 2008). At the June 3 hearing, the Bank appeared in this Court through its attorney, Ray Terpstra. Additionally, Curtis Brown appeared in his official capacity as President of the Bank. The Court finds that the Bank legally and properly "appeared" for the June 3 hearing, and it finds Mr. Recker's objection to be without merit.

B.     **Property of the Estate**

Throughout this adversary proceeding, Mr. Recker argued that the Bank was not entitled to the proceeds of the combine sale. He argued primarily that the combine was not his property and that it instead belonged to Mr. Miller. The Court had previously noted this was an important issue to be determined and set the case for trial. It was clear that if Mr. Miller's ownership of the combine – and thus Mr. Recker's non-ownership – was established, the Bank would not have any interest in the sale proceeds. In fact, if Mr. Miller owned the combine, the Trustee and Mr. Recker's bankruptcy estate would likewise have no interest in the proceeds from the sale of that combine. Those proceeds would belong to Mr. Miller. Mr. Recker also periodically argued that Mr. Recker had already paid off his entire debt to the Bank by submitting the "Bonded Promissory

14

Note" to the Bank. That would mean the Bank was without any further claim to the combine proceeds or any other payment from Mr. Recker or his bankruptcy estate.

Under section 541 of the Bankruptcy Code, all legal and equitable interests of a debtor in property when the debtor commences her bankruptcy case can become property of the estate. 11 U.S.C. § 541(a). The scope of this section is very broad. Whetzal v. Alderson, 32 F.3d 1302, 1303 (8th Cir. 1994). Property of the estate also includes any proceeds or profits of or from the sale of property of the estate. 11 U.S.C. § 541(a)(6). "[P]ossession of property raises a rebuttable presumption of ownership." In re Williams' Estate, 45 N.W.2d 146, 148 (Iowa 1950).

1.  **Mr. Miller's Ownership of the Combine Was Not Established**

Mr. Recker's only real argument that the combine proceeds were not property of his bankruptcy estate available to the Bank or any other creditors was based on his assertion that Mr. Miller, not Mr. Recker, actually owned the combine. At the hearing, the Bank first presented live testimony and numerous exhibits demonstrating that Mr. Recker originally possessed the combine, delivered it to Southwest Auction Company, received the proceeds from the combine sale, negotiated the proceeds check to Dean Benda in exchange for another check, and attempted to negotiate the check he received from Mr. Benda at the Bank. From purchasing the combine to consigning it to Southwest Auction Company to receiving the check for the combine sale proceeds, Mr. Recker consistently maintained possession and control over the combine or its sale proceeds. This is strong evidence of his ownership of the combine – and that the sale proceeds are property of Mr. Recker's bankruptcy estate.

Though he made allegations that he was not the owner of the combine, Mr. Recker did not attend the hearing and thus failed to present any evidence he was not the owner of the combine. However, the Bank subpoenaed Mr. Miller – who Mr. Recker claimed was the owner – as a witness. Mr. Miller testified repeatedly and clearly that he was not the owner of the combine. He made clear that he never signed documents or made assertions of ownership. The Court finds that the evidentiary record is uncontradicted that Mr. Recker owned the combine and the sale proceeds are property of Mr. Recker's bankruptcy estate.

2.    **Bonded Promissory Note as Payment**

As noted above, Mr. Recker left the courtroom at the beginning of trial. He was not present for testimony and he offered no exhibits. Nevertheless, in response to the Court providing him additional time to submit a brief and legal arguments (in spite of the fact that he did not attend the trial), he submitted an "Affidavit of Fact" for the Court's consideration. The Court reads his Affidavit of Fact to suggest that he believes that the "Bonded Promissory Note" he provided to the Bank paid his debt to the Bank in full. Thus, the Court also construes Mr. Recker's affidavit to suggest that he believes he himself (not his Bankruptcy Estate) would be entitled to proceeds from the combine sale because he already made full payment to the Bank through his "Bonded Promissory Note."

There are several problems with Mr. Recker's position. First, the Court is left to speculate that this is his position, as Mr. Recker never made this specific argument. Thus, it follows that Mr. Recker never cited any authorities to support or even elucidate his apparent argument that the "Bonded Promissory Note" has any legal effect on these proceedings. The record is also entirely

16

silent (because Mr. Recker did not participate in the trial) as to what he believes a "Bonded Promissory Note" is or what effect it could have.

Without any evidence from Mr. Recker or legal authorities to support his position, the Court must look for guidance in the case law. The Court has not found a single case suggesting that "Bonded Promissory Notes" are legal tender or have any validity as a negotiable instrument or commercial paper. A number of recent cases examining similar arguments or similar documents, however, have specifically and unequivocally concluded that instruments fashioned as a "Bonded Promissory Note" have no legal validity. The most recent case summarizes the authority. Edwards v. Aurora Loan Services, LLC, 2010 WL 2740173 (E.D. Cal. July 9, 2010). In Edwards, the Court specifically addressed Plaintiff's contention that her "Bonded Promissory Note" was legal tender. Id. at *4. The Court noted: "to the contrary, courts reaching this issue have found the 'Bonded Promissory Note' not to be legal tender." Id. (citing Tesi v. Chase Home Finance, LLC, 2010 WL 2293177, *6 (N.D. Tex. June 7, 2010); Maxwell v. Chase Home Finance LLC, 2010 WL 1426699, *1-3 (S.D. Tex. Apr. 7, 2010); Wiggins v. Wells Fargo & Co., 2010 WL 342246, *2-3 (N.D. Tex. Jan. 29, 2010)). Bankruptcy courts addressing this issue have reached the identical conclusion. See e.g., In re Chabot, 411 B.R. 685, 704. In Chabot, the court specifically noted that the debtor engages in "egregious behavior" by attempting to tender "bogus bonded promissory notes in full payment . . ." Id. The court described the debtor's action of offering the "bonded promissory note" as "grasping at straws in her effort to deprive the secured creditor of its rights" and further noted that debtor's "participation with [the bonded promissory note's agent] in peddling bogus instruments demonstrates desperation, and egregious behavior which the Court is obligated to stop." Id. Other cases have similarly rejected any attempts by

debtors to satisfy their obligations through such documents. In re Vitale, 403 B.R. 107, 109 (M.D. Fla. 2007); In re Wrubleski, 380 B.R. 635, 637 (S.D. Fla. 2008). Courts have specifically found that the documents are bogus, do not constitute legal tender, and fail as negotiable instruments or any form of acceptable commercial paper. Chabot, 411 B.R. at 704 (describing a debtor's attempt to satisfy a mortgage with a "bogus bonded promissory note" as "egregious behavior" and "peddling bogus instruments"); Wiggins, 2010 WL 342246 at *3 (describing a bonded promissory note as "plainly devoid of value" and "not a negotiable instrument").

The Court has repeatedly offered Mr. Recker the opportunity to provide case citations or other legal authorities that support his arguments. He has not provided any such authority. In this Court's extensive research on the subject, it does not appear any legal authority exists to support his claims. In fact, the Court has become aware that some state and federal agencies have issued consumer fraud alerts directed as similarly issued "Bonded Promissory Notes." These alerts warn consumers that these written instruments have no legal effect – and should not be purchased or used in attempting to pay debts. The United States Department of the Treasury ("Treasury"), Office of Inspector General, for example, issued a notice warning the public of similarly styled promissory notes referencing the Treasury and often containing the name of the Secretary of the Treasury. The Treasury stated that these promissory notes were not legitimate legal tender, further stating that "the only type of paper bond issued by the U.S. Treasury that a citizen can purchase today is a U.S. Savings Bond." "U.S. Dept. of Treasury Press Release: Fraud Alert," Apr. 6, 2009. Multiple state and federal agencies have responded to the emergence of these invalid promissory notes by issuing their own additional warnings or administrative rulings. See Connecticut Dept. of Banking, "The Informed Investor: Promissory Note Scams," June 8,

18

2005; Fed. Reserve Bank of New York, "Scams Involving the Federal Reserve Name: Scams Involving Fraudulent Bonded Promissory Notes (BPNs)," Feb. 2010.  <u>See also</u> Ind. Dept. of State Rev. Priv. Ltr. Rul. 07-0419 (Sept. 19, 2007).

To the extent Mr. Recker has been misled by the issuer of the alleged "Bonded Promissory Note" or by any other source suggesting the validity of the instrument, that is unfortunate. The Bank, the case Trustee, and others associated with this adversary proceeding, however, had nothing to do with any mistaken understanding Mr. Recker might have had. If Mr. Recker was misled or defrauded, his remedy is against the party responsible for misleading or defrauding him. That is beyond the scope of the matter presently before the Court.

This Court is bound to follow the decided law. The case law is unanimous in rejecting similar "Bonded Promissory Notes" as legal tender. The Court must follow the settled law and reject Mr. Recker's argument that the "Bonded Promissory Note" satisfied his obligations to the Bank.

The Court notes a further problem with Mr. Recker's "Bonded Promissory Note" argument. Even if the Court had accepted the argument, it would only affect the Bank's claim against the bankruptcy estate. It would not prevent the combine proceeds from being property of Mr. Recker's bankruptcy estate. In other words, the combine proceeds would not return to Mr. Recker even if the "Bonded Promissory Note" somehow paid the Bank. Instead, the proceeds would go to the bankruptcy estate for distribution by the case Trustee to Mr. Recker's other creditors.

Mr. Recker's passing reference (in his continuance request and post-trial affidavit) to an argument that the Bank failed to present the "Original Note" suffers from similar problems. First,

that argument would only go to whether the Bank had a claim against Mr. Recker's bankruptcy estate. In other words, even if the Bank failed to produce the original documentation of Mr. Recker's debt to the Bank, it would only be a defect in the Bank's claim for payment against the proceeds of the bankruptcy estate. It would not change the fact that the combine proceeds would still return to the Trustee for distribution to other creditors—not to Mr. Recker. Moreover, the case Trustee has already settled any dispute the bankruptcy estate had with the Bank over the Bank's claim to any of the funds. The proposed settlement was properly noticed to all creditors and parties to the case with a July 21, 2010 bar date for objections. No objections were made. Thus, that agreement – splitting the combine proceeds between the Bank and Mr. Recker's bankruptcy estate – is final. Any argument the estate might have had about the absence of the original note was resolved by that settlement.

      The only way the combine proceeds would have been beyond the reach of Mr. Recker's bankruptcy estate (i.e., not property of the estate) and not subject the distribution to Mr. Recker's creditors is if the evidence established that Mr. Miller owned the combine. The evidence, however, was directly to the contrary. Mr. Miller specifically and repeatedly testified he did not own the combine. For that reason and all reasons stated above, the Court concludes the combine proceeds are property of Mr. Recker's bankruptcy estate.

      Dated and Entered: September 10, 2010

_____
THAD J. COLLINS
CHIEF BANKRUPTCY JUDGE